# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TYRONE S. WORKMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. N25C-01-370 KMV |
| | ) | |
| ASTRONAUT TOPCO, L.P.; ASTRONAUT | ) | |
| INVESTMENT, GP, L.L.C.; ASTRONAUT | ) | |
| INVESTMENT L.P.; ASTRONAUT | ) | |
| GUARANTOR GP, L.L.C.; ASTRONAUT | ) | |
| GUARANTOR, L.P.; ILC ASTROSPACE, | ) | |
| LLC; ASTRONAUT HOLDCO II, INC.; | ) | |
| ASTRONAUT PARENT, INC.; NEW ILC | ) | |
| DOVER, INC.; ILC DOVER 1, LLC; ILC | ) | |
| DOVER 2, LLC; and ILC DOVER LP, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Submitted: May 2, 2025
Decided: September 2, 2025

Tyrone S. Workman, Newark, DE; *Pro Se Plaintiff*.

Geoffrey G. Grivner, Kody M. Sparks, BUCHANON INGERSOLL & ROONEY PC, Wilmington, DE; Gavin J. Rooney, LOWENSTEIN SANDLER LLP, New York, NY; *Counsel for Defendants*.

**VAVALA, J.**

A company, known for making spacesuits used by astronauts, hired an attorney to facilitate the company's sale to a prospective buyer. The company offered a one-time cash transaction bonus to the attorney as part of a non-disclosure agreement. Dissatisfied with the bonus offered, the attorney negotiated with the company for different terms. Negotiations reached an impasse, but the attorney continued working on the sale. In time, the attorney discovered he would not receive the bonus. Just before the sale's closing, he resigned to sue the company and its affiliates, anticipating their dispersal, and pursued various contractual claims.

The company moved to dismiss. The attorney's claims for legal fraud, implied contract, repudiation, and breach of the implied covenant of good faith and fair dealing all lack merit. His claim for equitable fraud is barred by lack of jurisdiction and claim preclusion. Thus, those five claims must be dismissed. But at this early juncture, the Court finds the attorney's claim for promissory estoppel may proceed.

## I.     BACKGROUND

In October 2019, Tyrone S. Workman ("Plaintiff") started working as a corporate attorney for ILC Dover LP (the "Company").[1] The Company is an engineering and manufacturing company that specializes in high-performance

---

[1] Because the motion to dismiss is sought collectively, the "Company" refers to, and this decision addresses, all defendants. These facts are taken from the complaint. Docket Item ["D.I."] 1 ["Compl."].

2

flexible materials, serving the aerospace, personal protection, pharmaceutical, and biopharmaceutical industries.[2] During his employment, Plaintiff reported to Patrick Weinberg, the Company's chief financial officer ("CFO").[3] Although not officially appointed as general counsel, Plaintiff's role and responsibilities quickly expanded beyond their original scope, effectively making him the de facto general counsel for the Company.[4]

### A. The Bonus and Project Orion

In April 2023, the Company initiated negotiations for its sale to a prospective buyer.[5] As the sole in-house counsel, Plaintiff was recruited to undertake the essential and "extraordinary" legal work required during the initial sale attempt, called "Project Orion."[6] A month later, the Company sent Plaintiff a non-disclosure agreement, offering a "one-time cash Transaction Bonus in the amount of $20,000" (the "Bonus") once the sale closed and contingent upon him signing it (the "NDA").[7]

The NDA specified if Plaintiff's employment with the Company ended for any reason before the transaction closed, or if the transaction was not completed by

---

[2] Compl. ¶ 8.

[3] *Id.* ¶¶ 3, 11.

[4] *Id.* ¶ 8.

[5] *Id.* ¶ 10.

[6] *Id.*

[7] *Id.* ¶¶ 10–16; *id.* Ex. A ["NDA"] § 1.

May 26, 2024, he would forfeit the Bonus.[8]  It also clarified that nothing in the agreement guaranteed continued employment, and the Company could terminate Plaintiff at any time.[9]

Plaintiff thought the Bonus inadequate, so in June 2023 he wrote to CFO and Kelly Lawry, the Company's chief human resources officer ("CHRO"), seeking more staff for the legal department, a title change from Corporate Attorney to General Counsel, and a raise of his base salary and other compensation (the "Memo").[10]  The Memo outlined that Plaintiff's supplemental compensation should match the formula the Company used for a prior sale of $3.15 million where he received $7,500—equating to .00238% of the sale.[11]  Plaintiff believed two prior payouts for his work on sale transactions set a precedent, so he anticipated compensation like other professionals and senior leadership with equity agreements who received substantial supplemental compensation for a company sale.[12]

In response to the Memo, CFO met with Plaintiff at a restaurant in Bear, Delaware in August 2023 (the "First Meeting").[13]  CFO allegedly acknowledged and agreed to Plaintiff's objections and represented he would raise such issues with the

---

[8] NDA § 1.

[9] *Id.* § 1.

[10] Compl. ¶¶ 17–20; *id.* Ex. B ["Memo"].

[11] Compl. ¶ 17.

[12] *Id.*

[13] *Id.* ¶¶ 17–20.

Company's board.[14]  But before the dispute was resolved, the first sale attempt was abandoned.[15]

In February 2024, the Company began negotiating its sale to a new buyer, Ingersoll Rand, Inc.[16]  Plaintiff was again recruited to support the second sale attempt.[17]  Relying on "the implied contract established by the Letter NDA" and CFO's representations at the First Meeting, Plaintiff "immediately began to perform in good faith as an at-will employee otherwise subject to termination for any reason, at any time."[18]

In March 2024, CHRO sent Plaintiff a "recycled, unmodified" NDA, which he again refused to sign.[19]  CHRO allegedly pressured Plaintiff to sign immediately, as the asset purchase agreement required a schedule of individuals receiving bonus compensation to be disclosed to the buyer.[20]  CHRO allegedly used time constraints and intimidation, threatening that Plaintiff would forfeit the Bonus if he did not promptly sign the NDA.[21]  Aside from a change in consummation date, there were

---

[14] *Id.*

[15] *Id.* ¶ 15.

[16] *Id.* ¶ 21; D.I. 15 ["MTD"] at 4–5.

[17] Compl. ¶ 22.

[18] *Id.*

[19] *Id.* ¶¶ 23, 25–26.

[20] *Id.* ¶ 23.

[21] *Id.*

5

no revisions to the NDA supporting CFO's representations to Plaintiff at the First Meeting.[22]

Plaintiff emailed CFO reminding him of such representations.[23] That same day, on a virtual Teams meeting, CFO allegedly (1) dodged the prior representations made, (2) denied any employee was receiving a retention bonus, (3) affirmed the Bonus was for additional work, and (4) stated Plaintiff needed to sign the NDA to receive it.[24] Less than two weeks later, the Company announced its sale to Ingersoll Rand for $2.325 billion (the "Sale").[25]

During a routine meeting with CFO in April, Plaintiff discovered he was not listed for a bonus, which he interpreted as a repudiation of an implied contract.[26] CFO reiterated that Plaintiff would only appear on any bonus schedule if he signed the NDA, and confirmed that no employee had a retention agreement.[27] Plaintiff ultimately resigned on April 19, 2024, citing the Company's bad faith and intending to preserve his claims.[28]

B.    Procedural History

---

[22] *Id.* ¶ 24.

[23] Compl. ¶ 26.

[24] *Id.*

[25] *Id.* ¶ 3.

[26] *Id.* ¶ 28.

[27] *Id.* ¶ 27.

[28] *Id.* ¶ 30.

In June 2024, Plaintiff sued the Company in the Court of Chancery seeking over $22 million in damages ($5,533,500 in compensatory damages and $16,600,500 in punitive damages).[29] The Court of Chancery dismissed the case without prejudice—except the equitable fraud claim—for lack of subject matter jurisdiction, as the claims were legal, not equitable, and allowed transfer to the Superior Court.[30]

On January 27, 2025, Plaintiff brought this action against the Company alleging six counts: (I) fraud; (II) equitable fraud; (III) promissory estoppel; (IV) implied contract; (V) repudiation; and (VI) breach of the implied covenant of good faith and fair dealing (the "Complaint").[31] The Company then moved for dismissal for failure to state a claim (the "Motion").[32] Once briefing was completed, the Court held a hearing to address the Motion, after which it took this matter under advisement.[33]

## II.     DISCUSSION

The Company seeks dismissal for failure to state a claim under Rule 12(b)(6)

---

[29] *Workman v. Astronaut Topco, L.P.*, 2024 WL 4524110, at *2 (Del. Ch.), *adopted*, 2024 WL 4719911 (Del. Ch. Nov. 7, 2024).

[30] *Id.* at *3 (the equitable fraud claim was dismissed with prejudice because the court found no special relationship between the parties).

[31] *See generally* Compl.

[32] *See generally* MTD.

[33] D.I. 16–18. Workman submitted a letter as a "postscript summation" to the Hearing. D.I. 19–20.

of the Superior Court Rules of Civil Procedure ("Rules"). At this stage, the Court must view a plaintiff's complaint in the light most favorable to him, accept all well-pleaded allegations in the complaint as true, and draw all reasonable inferences that logically flow from those allegations.[34]

The pleading threshold to survive a motion to dismiss is low—even vague allegations or those lacking in detail may still be well-pled, so long as they put the opposing party on notice of the claim.[35] But even under this liberal pleading test, the Court may dismiss an action when "the case cannot succeed on any reasonably conceivable set of circumstances susceptible to proof."[36] That is, a complaint must still provide the Court with enough facts to conduct a meaningful consideration of the merits.[37] In this context, the Court need not "accept as true conclusory assertions unsupported by specific factual allegations."[38] Nor is it required to draw

---

[34] *Windsor I, LLC v. CWCap. Asset Mgmt. LLC*, 238 A.3d 863, 871 (Del. 2020) (citing *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1160 (Del. 2010)); *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005).

[35] *Doe*, 884 A.2d at 458 (first citing *Ramunno v. Crawley,* 705 A.2d 1029,1034 (Del. 1988); and then citing *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 611 (Del. 2003)).

[36] *Cousins v. Goodier*, 283 A.3d 1140, 1147 (Del. 2022) (citing *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 538 (Del. 2011)); *Cooper v. Cadia Pike Creek*, 2021 WL 409156, at *1 (Del. Super. Feb. 4, 2021).

[37] *Harrison v. Hodgson Vocational Tech. High Sch.*, 2007 WL 3112479, at *2 (Del. Super. Oct. 3, 2007).

[38] *Ramunno*, 705 A.2d at 1034; *see also Majkowksi v. Am. Imaging Mgmt. Servs., LLC*, 913 A.2d 572, 581 (Del. Ch. 2006).

"unreasonable inferences in the plaintiff's favor"[39] or "accept every strained interpretation of the allegations proposed" by the plaintiff.[40]

### A. Legal Fraud

The Company argues Plaintiff's fraud claim must be dismissed because the Complaint does not allege a false representation as required by Rule 9(b). Plaintiff contends his Complaint sufficiently pled that the Company's conduct at and after the First Meeting, along with the "recycled, unmodified" NDA, constitutes fraud. The Court finds the allegations in the Complaint regarding fraud fail to meet the specificity requirements of Rule 9(b).

"[P]leading standards for fraud claims are heightened."[41] A fraud plaintiff must plead facts showing

> (1) a false representation made by the defendant; (2) the defendant knew or believed the representation was false or was recklessly indifferent to its truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted or refrained from acting in justifiable reliance on the representation; and (5) damage resulted from such reliance.[42]

---

[39] *Windsor*, 238 A.3d at 871 (citing *Deuley*, 8 A.3d at 1160).

[40] *Malipede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001); *Cooper*, 2021 WL 409156, at *1.

[41] *Valley Joist BD Hldgs., LLC v. EBSCO Indus., Inc.*, 269 A.3d 984, 988 (Del. 2021).

[42] *Liborio III, L.P. v. Artesion Water Co.*, 306 A.3d 529 (Del. 2023) (TABLE) (quoting *Valley Joist*, 269 A.3d at 988).

These allegations must be stated with particularity.[43] This means the plaintiff must specify the time, place, and content of the false representations, the facts that were misrepresented, the identity of the person(s) making the misrepresentation, and what they gained from it.[44]

In *Valley Joist BD Holdings, LLC v. EBSCO Industries, Inc.*, our Supreme Court reversed the dismissal of a fraud claim where the complaint alleged facts from which it could reasonably be inferred that the misrepresentation was knowable and the defendant was in a position to know it.[45] There, the plaintiff alleged the defendant, through a written agreement, made a fraudulent misrepresentation by stating certain assets were in good operating condition. The complaint included allegations that the defendant informed the plaintiff about the defective assets before the sale and knew that repairing the defects would cost millions. The Court found such allegations sufficient to allege knowledge and survive a motion to dismiss.

In *Liborio III, L.P. v. Artesian Water Co.*, our Supreme Court affirmed the trial court's dismissal of a fraud claim where the plaintiff failed to plead facts with particularity.[46] There, the plaintiff's "failure to read and know the terms of its own

---

[43] Super. Ct. Civ. R. 9(b) ("In all averments of fraud, . . . the circumstances constituting fraud . . . shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally.").

[44] *Liborio*, 306 A.3d 529 (quoting *Valley Joist*, 269 A.3d at 988).

[45] *Valley Joist*, 269 A.3d at 989–90.

[46] *Liborio*, 306 A.3d 529.

written contracts and relevant regulations clearly and expressly referenced in those contracts doom[ed] its claim."[47] The Court found the plaintiff could not claim justifiable reliance on any alleged misrepresentation by the defendant because the relevant regulation was plainly referenced in the contract, and the plaintiff had the opportunity to review it.

Here, the Company argues CFO's acknowledgment of Plaintiff's objection to the Bonus and CFO's offer to raise the issue with the Board are not statements of fact that can be deemed true or false. Building on this, the Company contends the Complaint does not allege CFO promised any bonus—only that he agreed to raise the issue with his superiors—which does not constitute a false statement. The Company also asserts there was no duty to disclose, as there was no special relationship between the parties that would create such a duty.[48]

Like *Valley Joist*, the Complaint alleges CFO knew, yet refused to inform the Board, about Plaintiff's demands. But that is where the similarities end. Plaintiff seems to argue that CFO's misrepresentations—agreeing that the NDA was an improper tool to issue the Bonus, acknowledging $20,000 was not commensurate with Plaintiff's performance, and promising to bring Plaintiff's objections to the Board—constitute fraudulent misrepresentations. He is incorrect. And, unlike

---

[47] *Id.* (quoting *Valley Joist*, 269 A.3d at 988) (citation omitted).
[48] D.I. 15 at 6–7.

11

*Liborio* and *Valley Joist*, the alleged misrepresentations by CFO are not plainly referenced in a written agreement. Finally, the Complaint fails to allege how CFO fraudulently induced Plaintiff to enter any agreement or a duty to disclose. Because the Complaint fails to allege multiple elements of a fraud claim, the analysis ends here. Accordingly, Count I is dismissed.

## B. Equitable Fraud

The Company argues Plaintiff's equitable fraud claim must also be dismissed. The Court agrees. First, an equitable fraud claim, even "if adequately pled, can be adjudicated only in a court of equity."[49] The Superior Court only provides legal, not equitable, relief; accordingly, the Court lacks subject matter jurisdiction over this claim. Second, the Court of Chancery already dismissed this claim with prejudice because it found no special relationship between the parties.[50] So it is barred by claim preclusion.[51] Finally, Plaintiff failed to raise this issue outside the recycled Complaint, and "[i]ssues not briefed are deemed waived."[52] Accordingly, Count II

---

[49] *Workman*, 2024 WL 4524110, at *2 (cleaned up).

[50] *Id.* at *2 (cleaned up).

[51] It is settled that "*res judicata* bars a court or administrative agency from reconsidering conclusions of law previously adjudicated while collateral estoppel bars relitigation of issues of fact previously adjudicated. Both doctrines require a final determination." *Sanders v. Turner*, 326 A.3d 348, (Del. July 22, 2024) (citing *Betts v. Townsends, Inc.*, 765 A.2d 531, 534–35 (Del. 2000). Because Count II was previously adjudicated by the Court of Chancery, it is precluded.

[52] *Emerald P'rs v. Berlin*, 765 A.2d 1215, 1224 (Del. 1999) (first citing *Murphy v. State*, 632 A.2d 1150, 1152 (Del. 1993); and then citing *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 140 n.3 (Del. 1997)).

12

is dismissed.

## C. Promissory Estoppel

The Company argues the promissory estoppel claim should be dismissed due to lack of a promise and injury and because Plaintiff's reliance was objectively unreasonable. Plaintiff challenges that interpretation of the facts and law, insisting the NDA reflects the Company's expressed intent and reasonable expectation that it would induce him to perform "additional professional services."[53] That may be.

A promissory estoppel claim requires clear and convincing evidence that (1) a promise was made, (2) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee, (3) the promisee reasonably relied on the promise and took action to his detriment, and (4) such promise is binding because injustice can be avoided only by enforcement of the promise.[54] In short, this doctrine aims to prevent injustice—either by acting as a wholesale substitute for consideration—or by providing relief to one who has a reasonable expectancy a promise will be fulfilled and is injured in reliance upon it.[55] Still, the doctrine is

---

[53] MTD Opp'n at 30.

[54] *Windsor*, 238 A.3d at 876 (quoting *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 647–48 (Del. 2013)); *Straine DM Hldgs. LLC v. Breault*, 2025 WL 275408, at *9 (Del. Super. Jan. 22, 2025) (citing *Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000)).

[55] *Riverside Risk Advisors LLC v. Chao*, 2022 WL 14672745, at *31–32 (Del. Ch. Oct. 26, 2022) (quoting *Chrysler Corp. (Delaware) v. Chaplake Hldgs., Ltd.*, 822 A.2d 1024, 1034 (Del. 2003)), *aff'd*, 303 A.3d 51 (Del. 2023).

narrow.[56]  A promissory estoppel claim "requires a real promise, not just mere expressions of expectation, opinion or assumption."[57] In other words, such a promise must be reasonably definite and certain."[58]  Determining a party's intent to be bound by a promise is an objective inquiry that focuses on the overt manifestation of assent, not subjective intent.[59]  For a court to conclude that the parties intended to be bound—and enforce the agreement as a binding contract—all essential terms must be agreed upon[60]

Here, the key inquiries are if it is reasonably conceivable, based on the facts alleged in the Complaint, that (1) the Company promised to give Plaintiff the Bonus; (2) the Company reasonably could have expected that such promise would induce Plaintiff to act, or not, in reliance on that promise; (3) Plaintiff reasonably relied on the promise to his detriment; and (4) injustice can be avoided only by enforcement

---

[56] *Alltrista Plastics, LLC v. Rockline Indus., Inc.*, 2013 WL 5210255, at *9 (Del. Super. Sept. 4, 2013) (first citing *Lord*, 748 A.2d at 404–05; and then citing *Ramone v. Lang*, 2006 WL 905347, at *14 (Del. Ch. Apr. 3, 2006)).

[57] *Hyetts Corner, LLC v. New Castle Cty.*, 2021 WL 4166703, at *8 (Del. Ch. Sept. 14, 2021) (cleaned up); *Straine*, 2025 WL 275408, at *9 (quoting *James Cable, LLC v. Millennium Digit. Media Sys., L.L.C.*, 2009 WL 1638634, at *5 (Del. Ch. June 11, 2009)). A "promise" is the "manifestation of an intention to act or refrain from acting in a specified manner, conveyed in such a way that another is justified in understanding that a commitment has been made; a person's assurance that the person will or will not do something." *Promise*, Black's Law Dictionary (12th ed. 2024).

[58] *Id.*

[59] *Eagle Force Hldgs, LLC v. Campbell*, 187 A.3d 1209, 1229 (Del. 2018).

[60] *Id.*

14

of that promise. The first factor is hotly contested.

The Company relies on the Court of Chancery's holding in *Hyetts Corner, LLC v. New Castle County* to support its contention that no promise was made.[61] In *Hyetts*, a dispute arose over landscaping and maintaining open space in a new housing development. The land developer claimed the county, through its representative, made a promise to provide a completion agreement related to the developer's ongoing permit issues with its land.[62]

After reviewing the emails at issue, the court found the county did not manifest an intent to be bound. The statement, "I plan to have the Completion Agreement done tomorrow, after which I will review it with Public Works and forward to you for execution next week," constituted mere speculation, not finalized terms.[63] In a subsequent email, the county's apologetic statement, "I promised you that I would have the agreement ready for the developer to execute this week[,]"[64] does not change how a reasonable person would have viewed the county's original message. Nor would the statement, "If I were to craft a new Completion Agreement,

---

[61] 2021 WL 4166703, at *8–9.

[62] *Hyetts*, at *9 (quoting *Port Penn Hunting Lodge Assoc. v. Meyer*, 2019 WL 2077600, at *9 (Del. Ch. May 9, 2019)) (noting the developer's promissory estoppel claim was unavailable against the county because Delaware has generally foreclosed such claims against government entities, except in limited circumstances like employment).

[63] *Id.* at *4, *7.

[64] *Id.*

it would have to be something generic along the lines of . . . ."[65]   These were speculative terms for a potential agreement, not an offer, as a reasonable negotiator in the developer's position could not have believed the email concluded the negotiations.

The court found the language conditional and could not be reasonably interpreted as a commitment by the county to enter into an agreement on those terms. Instead, the emails were seen as part of a negotiation or an expression of the county's bargaining position.[66]   The emails did not include a clear and definite promise to finalize an agreement by a specific date because it simply stated expectations, contingent on third-party approval.[67]   An offer conditioned on yet-unreceived approval from a third party is not sufficiently definite and certain to state a claim for promissory estoppel.[68]   Because the emails were advancing the parties' negotiations, not resolving all essential terms, the Court deemed they lacked the definiteness and certainty required to constitute a real promise for a promissory estoppel claim.[69]

In *Apennine Acquisition Co. v. Quill*, the Court of Chancery examined

---

[65] *Id.* (emphasis removed).

[66] *Id.* at *9 (citing *James Cable, LLC v. Millennium Digit. Media Sys., L.L.C.*, 2009 WL 1638634, at *5 (Del. Ch. June 11, 2009)).

[67] *Hyetts*, 2021 WL 4166703, at *9.

[68] *Id.*

[69] *Id.*

whether musings in an email could establish an enforceable contract.[70]  There, the parties aimed to form a joint venture, and the defendant emailed the plaintiff stating, "Here is how I see the deal/paper working out[,]" and inviting questions or concerns.[71]    After receiving no response for over a month, he followed up with, "Are we good to proceed to document here?"[72]  The court found the email reflected uncertainty about the specific terms of their relationship and the joint venture.[73]  Instead of confirming definite terms, the email expressed the defendant's perspective on how the relationship might work.  The follow-up email was also unresolved, leading the court to find a reasonable negotiator would not believe the negotiations had concluded.[74]

In *Straine DM Holdings LLC v. Breault*, this Court allowed a promissory estoppel claim to survive dismissal.[75]  The dispute there involved a long-term business relationship between the defendant, a dental consulting firm, and the plaintiff, a practicing dentist.  The dentist began working with the firm and later became involved in the firm's operational transition.  The dentist served as the firm's

---

[70] 2023 WL 3139934, at *5–6 (Del. Ch.), *aff'd*, 2023 WL 3479574 (Del. Ch. May 12, 2023).

[71] *Apennine*, 2023 WL 3139934, at *5.

[72] *Id.*

[73] *Id.* at *6.

[74] *Id.*

[75] 2025 WL 275408, at *9 (Del. Super. Jan. 22, 2025).

chief clinical officer ("CCO") based on promises from the firm's chief executive officer ("CEO") that he would formally join the firm as CCO once certain acquisitions were completed.

The dentist alleged the CEO made specific promises regarding his compensation and benefits, including a significant financial return on his investment. The firm had issued a letter of intent which included terms for the dentist's employment with the firm. But negotiations soured when the firm changed the transaction structure and removed the CCO position from the transaction documents, leading the dentist to withdraw from the transaction. The dentist filed counterclaims, including promissory estoppel, after the firm initiated a breach of contract action against him.

This Court found the CEO's promises to the dentist were sufficiently definite and certain.[76] The CEO assured the dentist he would receive formal employment as CCO upon the initial closing of acquisitions. The firm held the dentist out as its CCO in presentations to investors, and a draft executive employment agreement was delivered to him, further evincing the definite nature of these promises. This Court determined the dentist's reliance on the promises was reasonable under the circumstances.[77] He had been serving as CCO before the letters of intent, and he

---

[76] *Straine*, 2025 WL 275408, at *9.

[77] *Id.* at *10.

18

relied on the CEO's authority as CEO of the firm. This Court noted the lack of legal counsel during oral communications and the dentist's assertion that he would not have engaged with the firm without the CCO promise supported the reasonableness of his reliance. This Court concluded the plaintiff's allegations sufficiently established both a definite and certain promise and reasonable reliance on that promise.[78] Thus, the promissory estoppel claim survived the motion to dismiss.

Here, the Company argues the Complaint fails to allege any promise to pay Plaintiff a transaction-related bonus—aside, of course, from the "specific offer to pay Plaintiff $20,000 in exchange for signing the NDA[.]"[79] It also contends CFO's statements about presenting Plaintiff's salary-related demands to the Board do not constitute a promise of payment. In that respect, the Company denies making any promise, yet admits its intent to pay Plaintiff at least $20,000 for his extra work associated with the sale. This quandary merits further factual development to resolve.

Conversely, Plaintiff contends there was a clear and definite promise. He may be right. Although Plaintiff twice refused to sign the NDA and responded with a Memo outlining objections and demands, the NDA reflects the Company's intent to issue the Bonus. Like *Straine*, CFO assured Plaintiff he would receive the Bonus

---

[78] *Id.* at *11.

[79] MTD at 13.

when the Sale closed.  And unlike the emails in *Hyetts* and *Apennine*, which were filled with speculation and uncertainty, the NDA does not merely outline the Company's perspective or hinge on third-party approval.  Instead, it promises to finalize an agreement by a specific date, reflecting the Company's intent to pay Plaintiff the Bonus upon the Sale, in exchange for him signing the NDA.

Diving deeper, the existence of a promise also turns on whether the Bonus was discretionary due to Plaintiff's status as an at-will employee.  A person serving at the pleasure of another is deemed an at-will employee and may be terminated for any reason or no reason at all.[80]  The Company argues the Complaint fails to allege detrimental reliance because Plaintiff continued working, fulfilling a pre-existing obligation that was neither a benefit nor a detriment.[81]  It emphasizes Plaintiff's status as an at-will employee without a contractual right to a bonus.[82]  True, a party cannot use a pre-existing duty as a legal detriment to form a contract,[83]  but the concept of legal detriment is more nuanced than the Company suggests.

---

[80] *Grimaldi v. New Castle Cty.*, 2016 WL 4411329, at *3 (Del. Super. Aug. 18, 2016) (citation omitted).

[81] *James J. Gory Mech. Contr., Inc. v. BPG Residential P'rs V, LLC*, 2011 WL 6935279, at *2 (Del. Ch. Dec. 30, 2011) (cleaned up) ("A commitment to honor a pre-existing obligation works neither benefit nor detriment; therefore, a promise to fulfill a pre-existing duty, such as a promise to pay a debt owed, cannot support a binding contract because consideration for the promise is lacking.").

[82] MTD at 8.

[83] *Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1232 (Del. Ch. 2000).

In *Tatum v. Fairstead Affordable LLC*, the Court of Chancery addressed legal detriment in an at-will employee's promissory estoppel claim at the pleading stage.[84] There, the defendants argued the plaintiff failed to demonstrate legal detriment, asserting he was compensated under the employment agreement. The court rejected this, noting a genuine dispute over whether the employment agreement covered a specific project. The plaintiff claimed he suffered legal detriment by not negotiating for a higher salary or bonus and by working on the project based on the defendant's promise. As an at-will employee, he could have left at any time but chose to stay and fulfill his duties.[85] The court found these allegations sufficient to meet the requirement to pleading injury, even when framed as legal detriment.[86]

In the employment context, "bonuses" are "paid for services or on consideration in addition to or in excess of the compensation that would ordinarily be given."[87] Employers offer bonuses and other incentive compensation to motivate employees.[88] Whether these bonuses are a right or discretionary depends on the relevant agreement and any binding promises or policies from the employer. Key factors include (1) whether the bonus is explicitly stated as discretionary; (2) whether

---

[84] *Tatum v. Fairstead Affordable LLC*, 2023 WL 8868060, at *6 (Del. Ch. Dec. 22, 2023).

[85] *Tatum*, 2023 WL 8868060, at *7.

[86] *Id.*

[87] *Bonus*, Black's Law Dictionary (12th ed. 2024).

[88] *Restatement of Employment Law: Bonuses and Other Incentive Compensation* § 3.02 cmt. c (2015).

the criteria for receiving it are based on objective measures, like tenure or sales targets, rather than subjective assessments; and (3) the parties' course of dealing.[89] Likewise, employers sometimes provide bonuses not primarily to motivate exceptional performance, but to retain employees during periods of corporate change.[90] These "stay bonuses" typically become earned compensation once the specified conditions are met.[91]

Plus, even if no agreement, binding promise, or policy statement covers the compensation dispute, quantum meruit may still apply.[92] These equitable principles are used to prevent unjust enrichment as needed.[93] In certain situations, binding employer promises and unilateral policy statements, upon which an employee has reasonably relied to their detriment, can create vested or accrued rights.[94] These rights cannot be unilaterally altered or rescinded; any adverse change requires the

---

[89] *Id.* ("Important factors include (1) whether the documents establishing the bonus expressly state that it is a discretionary award; (2) whether the criteria for receiving the bonus are keyed to objective measures of employee conduct (such as remaining with the employer for a particular period of time) or performance (such as achieving certain sales objectives) rather than purely subjective assessments by the employer; and (3) the parties' course of dealing.").

[90] *Id.*

[91] *Id.* § 3.02 cmt. d (2015).

[92] *Restatement of Employment Law: Right to Earned Compensation* § 3.01 cmt. a (2015).

[93] *Id.*

[94] *Restatement of Employment Law: Modification of Compensation or Benefits* § 3.04 cmt. b (2015).

employee's consent, supported by consideration.[95]  And even if the employment relationship is terminable at the will of either party, the employer nevertheless is obligated to pay the agreed earned compensation for the services the employee rendered.[96]

Here, like *Tatum*, the parties dispute whether the salary employment agreement covers the Bonus.  Plaintiff concedes the discretionary nature of standard bonuses for past performance but contends that post-hire negotiations can address future bonuses for extraordinary events, such as a profitable company sale.[97] Plaintiff also argues the Company's lack of clarity on the definition or legal standard of "discretionary" is telling.[98]  The NDA is silent on this issue, and no company policy is attached to the Complaint.  Thus, Plaintiff's entitlement to the Bonus raises questions of fact that cannot be determined at this stage in the pleadings.  Further discovery is needed.

The Company reasonably could have expected that the NDA and CFO's representations would induce Plaintiff to detrimentally rely on such representations. The NDA could be reasonably interpreted as a commitment by the Company to enter the agreement on those terms (the Company admits as much).  Those terms were

---

[95] *Id.*

[96] *Id.* § 3.01 cmt. c.

[97] MTD Opp'n at 13–14.

[98] *Id.* at 17–21; D.I. 20 at 4–5.

23

definite and certain—the Company would pay Plaintiff a Bonus in connection with the Sale when he signed the NDA. And CFO's assurances about discussing the contractual dispute with the Board match the intent of the Company to compensate Plaintiff for his extra work related to the Sale. CFO's statements may represent the Company's perspective on how the relationship might work. So at this stage, Plaintiff has proffered sufficient facts to show a reasonable expectation by the Company that Plaintiff would rely on the Bonus to stay with the Company through its Sale.

Accepting these well-pled allegations as true, the Company's promise went beyond mere expressions of expectation. The delivery of a draft NDA evinces the definite nature of the promise. The Company may not have agreed with the Plaintiff's compensation calculations set forth in his Memo, but he only had past payments (from lesser sales) as a blueprint. Plaintiff insists the Company, as his employer, had superior bargaining power during negotiations. He claims he faced pressure from CHRO to promptly sign the NDA or risk forfeiting the Bonus. And CFO repeatedly assured Plaintiff that he would present the Board with Plaintiff's concerns about being fairly compensated for his efforts in facilitating the Sale.

Thus, it is reasonably conceivable that Plaintiff would detrimentally rely on the promise under the circumstances. Another salient point is the parties' course of dealing. Following negotiations with the CFO, Plaintiff's role and responsibilities

24

quickly expanded beyond their original scope, effectively making him the de facto general counsel for the Company. And, like *Tatum*, the Company paid bonuses to Plaintiff during prior transactions that required work outside his ordinary responsibilities. Plaintiff relied on the Company's past conduct, the NDA's unambiguous terms, and CFO's assurances by choosing to stay and perform beyond his normal duties to facilitate the Sale based on the Company's promise.

Finally, dismissing the claim would result in injustice. The Company argues dismissal would not result in injustice because the Plaintiff was offered, and refused, the Bonus. It further contends Plaintiff was compensated because he continued to work and receive his regular salary. But that contention misses the mark. It is undisputed Plaintiff's work in connection with the Sale was outside the scope of his ordinary business duties. His extra efforts in support of the Sale, offered in exchange for the Bonus, was adequate consideration and thus binding.

Based on the facts alleged in the Complaint viewed in a light most favorable to the nonmovant, it is reasonably conceivable that a promise was made, the Company could have expected Plaintiff to rely on it detrimentally by staying through the Sale, and, to avoid injustice, enforcement of the promise is necessary. Accordingly, the Complaint states a viable claim for promissory estoppel.

### D. Implied Contract

The Company argues the implied contract claim must be dismissed because

25

Plaintiff's salary agreement governed his compensation, and there was no additional benefit to the Company warranting extra compensation. Conversely, Plaintiff contends he had a vested interest in continuing to provide his professional legal services, which would facilitate the Sale and result in him earning supplemental compensation. Plaintiff relies heavily on the Memo, which comprised his demands for his additional services, to establish the existence of an implied contract. But the Court finds the opposite as there is no evidence of a meeting of the minds.

In Delaware, an implied-in-fact contract "is one inferred from the conduct of the parties, though not expressed in words."[99] To state a claim for an implied contract, a complaint must allege the parties' actions showed mutual agreement on all essential terms.[100] "In determining whether the parties' conduct implies a contract in fact, their conduct is evaluated from the perspective of a reasonable person, considering all of the attendant circumstances."[101] "The failure to object may be treated as acceptance."[102]

---

[99] *Gurney-Goldman v. Goldman*, 321 A.3d 559, 572 (Del. Ch. 2024) (cleaned up).

[100] *APEX Mech. & Fabrication, Inc. v. Milford Sch. Dist.*, 2025 WL 1412052, at *8 (Del. Super. May 14, 2025) (quoting *Ridley v. Bayhealth Med. Ctr., Inc.*, 2018 WL 1567609, at *7 (Del. Super. Mar. 20, 2018)).

[101] *Levey v. Brownstone Asset Mgmt., LP*, 2014 WL 3811237, at *10 (Del. Ch. Aug. 1, 2014) (quoting 1 *Williston on Contracts* § 1:5 (4th ed. 2014)), *aff'd*, 115 A.3d 1215 (Del. 2015).

[102] *5high LLC v. Feiler*, 2022 WL 3136612 (Del. Ch.), *judgment entered*, 2022 WL 3573927 (Del. Ch. Aug. 18, 2022).

"No contractual agreement is implied in fact where parties merely engage in negotiations, anticipating that their agreement ultimately will be memorialized in a written document."[103] And "Courts will not infer an implied-in-fact contract where an express contractual provision already exists on the same point. An express contract and an implied contract cannot coexist with respect to the same subject matter, and the former supersedes the latter."[104]

The Company contends the Complaint fails to allege Plaintiff performed services with an expectation that the Company would pay for them, and that circumstances should have put the Company on notice that payment was expected. The Company asserts no allegation suggests Plaintiff performed any services for which the Company should have expected a demand for a $5.5 million bonus above and beyond his salary. Rather, they expected Plaintiff to provide his legal services in return for his salary, particularly because there was no agreement between them regarding the Bonus. And for good reason, because Plaintiff's Memo was a counteroffer, as it sought to alter the original NDA terms by requesting additional staff, a title promotion, and a higher salary. Although the Company may not have responded immediately, the ensuing negotiations indicate they did not agree to these changes, showing no mutual agreement on essential terms. In short, there was no

---

[103] 1 *Williston on Contracts* ["*Williston*"] § 1:5, Westlaw (database updated May 2025) (citation omitted).

[104] *Williston* § 1:5 (citations omitted).

enforceable implied contract.  Accordingly, Count IV is dismissed.

### E. Repudiation

The Company argues the repudiation claim is baseless because the lack of a contractual basis belies that claim.  Plaintiff contends the Company's conduct, through CFO's statements and the NDA, constitutes a repudiation of any implied contract.  As noted, no implied contract existed—which is also fatal to the repudiation claim.

"Under Delaware law, repudiation is an outright refusal by a party to perform a contract or its conditions entitling the other contracting party to treat the contract as rescinded.  A statement not to perform unless terms different from the original contract are met also constitutes a repudiation."[105]  "A party repudiates a contract when it takes an action that constitutes a significant and substantial alteration of both the present and the reasonably anticipated future relations created by the agreement."[106]  "A party confronted with repudiation may respond by (i) electing to treat the contract as terminated by breach, (ii) by lobbying the repudiating party to

---

[105] *PJT Hldgs., LLC v. Costanzo*, 2025 WL 1417531, at *17 (Del. Ch. May 15, 2025) (internal quotation marks omitted) (quoting *CitiSteel USA, Inc. v. Connell Ltd. P'ship*, 758 A.2d 928, 931 (Del. 2000)).

[106] *Moscowitz v. Theory Ent., LLC*, 2020 WL 6304899, at *26 (Del. Ch.) (quoting *PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1014 (Del. Ch. Apr. 3, 2006)), *judgment entered*, 2020 WL 7043626 (Del. Ch. Nov. 30, 2020).

28

perform, or (iii) by ignoring the repudiation."[107]

Plaintiff asserts the Company's failure to list him on the bonus schedule amounts to an outright refusal. On the other hand, the Company contends no contract exists specifying obligations they failed to meet, and Plaintiff's resignation before the Sale vitiates any claim to a share of the transaction price. Before reaching whether "positive and unconditional" repudiation occurred, an enforceable contract must be established.[108] Because the Complaint does not demonstrate the existence of such a contract, repudiation cannot be a remedy. A party's conduct cannot be treated as rescission if no contract exists. Accordingly, Count V is dismissed.

### F.     Breach of the Implied Covenant of Good Faith and Fair Dealing

The Company argues the breach of the implied covenant of good faith and fair dealing claim must be dismissed. They assert the implied covenant does not apply to the facts of this at-will employment matter and Plaintiff's claims do not fit within the specific exceptions where the covenant would apply. An implied covenant inserts terms into a contract that the parties overlooked during negotiations.[109] "The

---

[107] *Henkel Corp. v. Innovative Brands Hldgs., LLC*, 2013 WL 396245, at *7 (Del. Ch. Jan. 31, 2013).

[108] *Fortis Advisors LLC v. Johnson & Johnson*, 2024 WL 4048060, at *44 (Del. Ch. Sept. 4, 2024) (quoting *W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, 2009 WL 458779, at *5 (Del. Ch. Feb. 23, 2009)).

[109] *Troy Ventures, LLC v. Kosloski*, 2025 WL 1172758, at *8 (Del. Super. Apr. 21, 2025) (citing *Kent Cty. Equip., Inc. v. Jones Motor Gp., Inc.*, 2009 WL 737782, at *5 (Del. Super. Mar. 20, 2009)).

party asserting the implied covenant has the burden of proving 'that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected.'"[110]  A sufficiently pled implied covenant claim requires "(i) a specific implied contractual obligation; (ii) a breach of that obligation; and (iii) resulting damage."[111]  Although the implied covenant attaches to every contract, it presupposes the existence of a contract.[112]

Plaintiff relies on a line of Delaware cases to argue a breach of the implied

---

[110] *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1117–18 (Del. 2022) (first quoting *Dieckman*, 155 A.3d 358, 367 (Del. 2017); then citing *Desert Equities, Inc. v. Morgan Stanely Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 n.16 (Del. 1993); and then citing *Amirsaleh v. Bd. of Trade of City of New York, Inc.*, 2009 WL 3756700, at *5 (Del. Ch. Nov. 9, 2009)).

[111] *Limitless Coffee*, 2024 WL 4233900, at *3 (citing *Cantor Fitzgerald, L.P. v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)). *See also Schatzman*, 2024 WL 4249939, at *7 (discussing the elements of an implied covenant claim); *Sheehan v. Assured P'rs, Inc.*, 2020 WL 2838575, at *11 (Del. Ch. May 29, 2020) (same); *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) (same).  An employer violates the implied covenant in at-will employment in four situations: (i) when termination violates public policy; (ii) when the employer misrepresents a crucial fact, leading the employee to rely on it to accept or remain in a position; (iii) when the employer uses superior bargaining power to withhold clearly identifiable compensation related to past service; and (iv) when the employer falsifies or manipulates employment records to fabricate grounds for termination. *Lidya Hldgs. Inc. v. Eksin*, 2022 WL 854688, at *2 (Del. Ch. Mar. 28, 2022) (quoting *Lord*, 748 A.2d 393, 400, 401 (Del. 2000)).

[112] *Brightstar Corp. v. PCS Wireless, LLC*, 2019 WL 3714917, at *11 (Del. Super. Aug. 7, 2019);  *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005); *Cincinnati SMSA Ltd. v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998) (explaining that "implying obligations based on the covenant of good faith and fair dealing is a cautious enterprise").  A claim for breach of the implied covenant is a claim for breach of contract except the operative provision is implied. *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010); *Limitless Coffee, LLC v. Mott's LLP*, 2024 WL 4233900, at *3 (Del. Super. Sept. 19, 2024); *Cygnus Opportunity Fund, LLC v. Washington Prime Gp., LLC*, 302 A.3d 430, 457 (Del. Ch. 2023).

covenant can "occur outside the termination of an employee."[113] None of those cases support that reading, as they pertain to insurance coverage or involve terminated employees. Here, it is undisputed that Plaintiff voluntarily resigned. And even if he was terminated, the absence of an implied contract means there can be no breach of an implied covenant appurtenant thereto.[114] Accordingly, Count VI is dismissed.

---

[113] MTD Opp'n at 38–41 (first citing *Dunlap*, 878 A.2d at 442 (explaining the insurer's refusal to cooperate and agree to a settlement for less than the liability coverage limits could constitute a breach of the implied covenant of good faith and fair dealing, as it deprived the insured of a third-party recovery without justification); then citing *Bailey v. Wilm.*, 766 A.2d 477, 480 (Del. 2001) (holding that allegations of procedural impropriety in termination proceedings did not establish a breach of the implied covenant of good faith and fair dealing, as there was no evidence of fraud, deceit, or manipulation of records to create fictitious grounds for termination); and then citing *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 101 (Del. 1992) (denying dismissal of an implied covenant claim where the employer allegedly induced the employee to accept a position under the false pretense of indefinite employment while secretly intending to replace him). *See Dunn v. FastMed Urgent Care, P.C.*, 2019 WL 4131010, at *7 (Del. Ch. Aug. 30, 2019) (dismissing an implied covenant claim where the plaintiff failed to state a claim because the contracts in question directly addressed the issues in dispute, leaving no terms to be implied).

[114] *See supra* § II.D.

31

### III. CONCLUSION

The Company's motion to dismiss is granted in part and denied in part. Count II is barred by claim preclusion. Counts I, IV, V, and VI are dismissed with prejudice. Count III states a viable claim for promissory estoppel.

**IT IS SO ORDERED.**

*/s/ Kathleen M. Vavala*
The Honorable Kathleen M. Vavala